# United States Court of Appeals
## For the First Circuit

No. 07-1061

KAREN STAMP,

Plaintiff, Appellant,

v.

METROPOLITAN LIFE INSURANCE COMPANY;
ADMINISTRATOR-BENEFITS, EXXONMOBIL BENEFIT PLAN;
EXXONMOBIL CORPORATION; EXXONMOBIL BENEFIT PLAN;
LIFE INSURANCE PROTECTION PLAN OF MOBIL OIL CORPORATION;
and LIFE INSURANCE PLAN OF MOBIL OIL CORPORATION,

Defendants, Appellees.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

[Hon. Ronald R. Lagueux, U.S. District Judge]

Before

Torruella, Lipez, and Howard,
Circuit Judges.

Fred L. Mason, Jr., with whom Mason Associates P.C. was on brief, for appellant.
Ian Linker, with whom Brooks R. Magratten, Catherine A. Shaghalian, and Vetter & White were on brief, for appellee Metropolitan Life Insurance Company.
Neal J. McNamara, with whom Nixon Peabody LLP was on brief, for appellees.

June 30, 2008

**LIPEZ**, **Circuit Judge**.  This case requires us to determine whether the plan administrator of an employee benefits plan governed by the Employees Retirement Income Security Act ("ERISA"), 29 U.S.C. §§ 1001-1461, may reasonably conclude that the insured, who was killed in a one-car collision with a tree while driving with a blood alcohol content ("BAC") of three times the legal limit, did not die as a result of an "accident" for purposes of his Accidental Death and Dismemberment ("AD&D") life insurance policies.  After careful review of the developing federal common law under ERISA, we uphold  the plan administrator's determination that, in this case, the insured was so highly intoxicated that his death was not an "accident."  In so doing, we affirm the judgment of the district court.

## I.

The facts are undisputed.  On August 2, 2002, Steven Stamp attended a meeting for employees of appellee Exxon Mobil Chemical Company ("Mobil") at a resort in Westbrook, Connecticut. The meeting consisted of presentations in the morning, a boat cruise in the afternoon, and dinner that evening.  Mr. Stamp spoke with his wife, appellant Karen Stamp, at 5:20 p.m. and confirmed that after dinner he planned to drive to his parents' home near Providence, Rhode Island, where she and their young daughter would join him to celebrate his brother's 40th birthday the next day. Mrs. Stamp attests that he did not sound impaired during the phone

call, that he "sounded in good spirits," and that he had enjoyed the meeting and cruise. Mr. Stamp consumed several alcoholic beverages during the boat cruise and at dinner, but his co-workers reported that he did not appear to be impaired or unsteady when he left the resort between 8:30 and 9:00 that evening.

At 9:20 p.m., while en route to the Providence area, Mr. Stamp placed a cell phone call to his friend Joe Kingsley, hoping to visit him on his way through Rhode Island. Kingsley declined, explaining that he needed to go to bed early. Kingsley described Mr. Stamp's mood as positive and upbeat and reported that he did not sound intoxicated.

The drive from Westbrook to Mr. Stamp's parents' house should have taken about an hour and a half. Cell phone billing records of calls placed through directory assistance at 9:51 p.m. and 9:58 p.m. indicate that Mr. Stamp was already in the Providence area at that time, but Mr. Stamp evidently did not go directly to his parents' house. MetLife and Mobil posit that he must have stopped somewhere and consumed additional alcohol instead. As further evidence of this stop, MetLife notes that Mr. Stamp's hand had a stamp on it that read "copy." In MetLife's view, this fact indicates that Mr. Stamp went to a bar where his hand was stamped at the door.

Just after midnight, Mr. Stamp died when his car went off the road in Johnston, Rhode Island and struck a tree. At the time

of his death, his BAC was .265%, more than three times the legal limit in Rhode Island.[1]  The police report described the road conditions at the time of the collision as dry, the traffic as light, and there were no other adverse driving conditions.[2]  The autopsy report concluded that the cause of death was "[m]ultiple injuries due to blunt force trauma," and noted "acute ethanol intoxication" as another significant finding.  The report classified the manner of death as "accidental."

Mrs. Stamp, the beneficiary of her husband's life insurance policies, submitted a claim for benefits.  Appellee Metropolitan Life Insurance Company ("MetLife"), acting as claim fiduciary, paid her claim for Basic Life Insurance benefits, but denied her claims for benefits from her husband's Basic and Voluntary AD&D policies.  MetLife left undetermined Mrs. Stamp's claim for benefits under an additional Occupational AD&D policy.

Mrs. Stamp submitted a timely appeal to Mobil, which, in its capacity as plan administrator, had "full and exclusive authority to make final determinations as to all issues concerning plan administration," including "discretionary and final authority to determine coverage and eligibility for benefits . . . [and] to

---

[1]  Rhode Island criminalizes driving with a BAC of .08% or higher. R.I. Gen. Laws § 31-27-2.  Increased penalties apply when the driver's BAC is greater than .15%.  Id. § 31-27-2(d)(1)(ii).

[2]  The police report used the term "accident scene," but it did not make any determination as to the cause of the crash.

interpret and explain the terms of the Life Insurance Program." Mobil denied Mrs. Stamp's appeal of the Basic and Voluntary AD&D benefit decisions, and rejected her claim for Occupational AD&D benefits.

The ERISA plan at issue provides that Basic and Voluntary AD&D benefits will be paid if the insured is "physically injured as a result of an accident and die[s] within 90 days as a result of that injury or accident." Occupational AD&D benefits will be paid if the insured's death occurs "within one year as a result of an injury caused by an occupational accident 'while at work.'" Mobil concluded that Mr. Stamp's death was not the result of an "accident," and therefore was not covered by his AD&D policies.[3] The denial letter explained:

> In your appeal submission you argue that the weight of legal authority compels me to find that the collision in this case was an "accident" within the meaning of the plan. Counsel has reviewed these and other cases and advises that the weight of authority under applicable Federal law would not compel such a finding.

---

[3] Mobil further determined that: (1) Mr. Stamp's death was caused by an "intentionally self-inflicted injury," and thereby excluded from coverage by the terms of the Basic and Voluntary AD&D policies; (2) Mr. Stamp was committing a "serious crime" when the collision occurred, excluding coverage under the terms of the Voluntary and Occupational AD&D policies; and (3) the collision did not occur "while at work" for the purposes of the Occupational AD&D policy. Because we conclude that Mobil did not act arbitrarily in denying benefits based on its application of the term "accident," we do not reach these other grounds for the denial.

In as much as I am not bound by law, I look to the purpose of the plan. I believe that the purpose of the plan is to protect participants from risks that are outside of their control. The risks flowing from driving while intoxicated are completely within the control of the participant. While it is true that certain behavior that increases risk (such as skiing or horseback riding) would not result in loss of coverage, [driving while intoxicated] can be distinguished because it unreasonably increases the risk associated with a normally safe activity by interfering with an individual's ability to perceive and respond to risk. To impose the costs of such unreasonable risk-taking on the plan would result in an unanticipated cost.

Mobil further explained that "[t]he fact that the coroner's report and the police report use the term 'accident' does not govern the proper interpretation under the plan."

Mrs. Stamp filed suit in district court, asserting claims for breach of contract and breach of fiduciary responsibility. The district court held that Mrs. Stamp's common law claims are preempted by ERISA and treated her suit as an ERISA enforcement action pursuant to 29 U.S.C. § 1132(a)(1)(B). Mrs. Stamp has not appealed that determination. On cross-motions for summary judgment, the district court reviewed Mobil's denial of benefits under an "arbitrary and capricious" standard and concluded that the "determination that Mr. Stamp's death was not accidental is reasonable and supported by substantial evidence in the record." The district court entered judgment in favor of MetLife and Mobil. Mrs. Stamp filed this timely appeal.

We review the district court's grant of summary judgment de novo. Wright v. R. R. Donnelley & Sons Co. Group Benefits Plan, 402 F.3d 67, 73-74 (1st Cir. 2005). Where, as here, the ERISA plan grants the plan administrator discretionary authority to make benefit determinations, we must uphold the administrator's determination unless it was "arbitrary, capricious, or an abuse of discretion." Id. at 74 (quoting Doyle v. Paul Revere Life Ins. Co., 144 F.3d 181, 183 (1st Cir. 1998)); cf. Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 115 (1989). Under this standard, we will uphold the denial of benefits if the plan administrator's decision was "'reasoned and supported by substantial evidence.'" Id. (quoting Gannon v. Metro. Life Ins. Co., 360 F.3d 211, 213 (1st Cir. 2004)). "Evidence is substantial if it is reasonably sufficient to support a conclusion . . . ." Gannon, 360 F.3d at 213.

Mrs. Stamp argued before the district court that this deferential standard of review was inappropriate because Mobil's contract with MetLife is "experience-rated," linking Mobil's premium costs to the number and size of claims presented. She asserted that this link represented a "structural conflict of interest" that would mandate a less deferential standard of review. However, Mrs. Stamp has abandoned this argument on appeal. In her brief, she merely cites the legal proposition that a conflict of

interest may reduce the degree of deference we owe the plan administrator; she does not argue that a conflict actually exists in this case.  Thus, this argument is waived.[4]  See United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.").  Consequently, we review the denial of benefits under the "arbitrary and capricious" standard.

### III.

Mr. Stamp's AD&D policies stated that MetLife would pay accidental death benefits if Mr. Stamp died as a result of an "accident."  The term "accident" is not defined in the plan documents.  The plan administrator had the task of applying this term to the circumstances surrounding Mr. Stamp's death.

In reviewing the administrator's denial of benefits, we are guided by the principles of the federal common law of ERISA. Pilot Life Ins. Co. v. Dedeaux, 481 U.S. 41, 56-57 (1987) (concluding that Congress intended for a federal common law to develop in the ERISA context); Wickman v. Northwestern Nat'l Ins. Co., 908 F.2d 1077, 1084 (1st Cir. 1990).  In particular, we rely on Wickman, a case in which we added to the ERISA common law by

---

[4]  Moreover, in MetLife v. Glenn, No. 06-923 (June 19, 2008), the Supreme Court determined that a "conflict of interest" exists when a single entity both funds the plan and evaluates the claims.  Slip op. at 5, 8.  Mrs. Stamp did not assert this form of conflict; here, MetLife funded the plan while Mobil made final benefit determinations.

formulating an approach for interpreting the ambiguous term "accident" in AD&D insurance policies. 908 F.2d at 1087-88.

We began with the principle that "the reasonable expectations of the insured when the policy was purchased is the proper starting point for a determination of whether an injury was accidental under its terms." Id. at 1088. But we noted that this was only a starting point. The operative inquiry into the insured's "expectations" in Wickman actually concerned the insured's state of mind at the time of the incident that caused his death, not at the time the policy was purchased. See id. at 1089 ("If he actually expected the result, even if he did not specifically intend it, then his actual expectations make his death not accidental."). We see no necessary inconsistency between these two formulations of the relevant time frame. The conclusion that the insured expected, or reasonably should have expected, that death would result from the particular conduct at issue is tantamount to the conclusion that no reasonable person, when buying an insurance policy, could expect that AD&D benefits would be paid out when his death results from that sort of conduct. In any case, aside from the reference to the expectations at the time of purchase as a "starting point," the analysis in Wickman makes no further reference to those expectations and is instead concerned solely with the insured's expectations related to the intentional conduct that caused his death. We adopt that approach as well.

The Wickman analysis thus began with an inquiry into the expectations of the insured at the time of the incident that caused his death. However, this subjective inquiry was not determinative. We held that even if "the fact-finder determines that the insured did not expect an injury similar in type or kind to that suffered, the fact-finder must then examine whether the suppositions which underlay that expectation were reasonable." Id. at 1088. We further observed that "'the subjective state of mind of the insured cannot be generally known.'" Id. at 1087-88 (quoting Hoffman v. Life Ins. Co., 669 P.2d 410, 419 (Utah 1983)). Thus, in the usual case, where the fact-finder will find "the evidence insufficient to accurately determine the insured's subjective expectation," the fact-finder "should then engage in an objective analysis of the insured's expectations." Id. at 1088. We framed this objective analysis as an inquiry into "whether a reasonable person, with background and characteristics similar to the insured, would have viewed the injury as highly likely to occur as a result of the insured's intentional conduct." Id. This reasonable person analysis, "when the background and characteristics of the insured are taken into account, serves as a good proxy for actual expectation." Id.

We then applied this framework to the particular facts in Wickman, where the insured died after falling from a railroad bridge, having intentionally climbed over the guardrail on the side

of the bridge.  Although there was some evidence that the insured intended to kill himself, we determined that his actual expectations could not be ascertained.  Id. at 1088.  Therefore, we applied the objective prong of the Wickman analysis and concluded that "[o]bjectively, he reasonably should have expected serious injury when he climbed over the guardrail and suspended himself high above the railroad tracks below by hanging on to the guardrail with only one hand."  Id. at 1089.  Consequently, we upheld the determination that his death was nonaccidental.[5]

Our reasoning in Wickman has been widely accepted by our sister circuits.[6]  See Eckelberry v. Reliastar Life Ins. Co., 469 F.3d 340, 343-45 (4th Cir. 2006).  Applying Wickman, federal courts

_____

[5]  In Wickman, we interpreted the term "accident" de novo, affording no deference to the plan administrator.  Although the case was decided about a year after the Supreme Court's statement in Firestone, 489 U.S. at 115, that a deferential standard of review should be applied where the benefit plan grants the administrator discretion to make benefit determinations, Wickman contains no discussion of the applicable standard of review.  We can only surmise that discussion of Firestone was unnecessary because the policy at issue in Wickman did not contain the critical discretionary language that would have altered the standard of review.

[6]  Some of these courts have struggled with whether a "reasonable foreseeability" test, which arguably is a less favorable test for the insured than the "highly likely" phrase in Wickman itself, may be used by a plan administrator without running afoul of Wickman.  See Lennon v. Metro. Life Ins. Co., 504 F.3d 617, 625 (6th Cir. 2007) (Boggs, C.J., concurring).  Although MetLife used the phrase "reasonably foreseeable" in its initial benefit denial, Mobil did not invoke that standard.  We review the decision of the plan administrator, Mobil.  As such, we have no occasion to comment on the acceptability of using "reasonable foreseeability" as a shorthand for Wickman.

-11-

have, "with near universal accord," upheld plan administrators' determinations that "alcohol-related injuries and deaths are not 'accidental' under insurance contracts governed by ERISA." Id. at 344; see also Lennon v. Metro. Life Ins. Co., 504 F.3d 617, 622-23 (6th Cir. 2007); Cozzie v. Metro. Life Ins. Co., 140 F.3d 1104, 1110 (7th Cir. 1998); Weatherall v. Reliastar Life Ins. Co., 398 F. Supp. 2d 918, 924 (W.D. Wis. 2005); Mullaney v. Aetna U.S. Healthcare, 103 F. Supp. 2d 486, 494 (D.R.I. 2000); Walker v. Metro. Life Ins. Co., 24 F. Supp. 2d 775, 782 (E.D. Mich. 1997); Schultz v. Metro. Life Ins. Co., 994 F. Supp. 1419, 1422 (M.D. Fla. 1997); Nelson v. Sun Life Assurance Co., 962 F. Supp. 1010, 1012 (W.D. Mich. 1997); Miller v. Auto-Alliance Int'l, Inc., 953 F. Supp. 172, 176-77 (E.D. Mich. 1997); Cates v. Metro. Life Ins. Co., 14 F. Supp. 2d 1024, 1027 (E.D. Tenn. 1996), aff'd, 149 F.3d 1182 (6th Cir. 1998) (unpublished). But see West v. Aetna Life Ins. Co., 171 F. Supp. 2d 856, 904 (N.D. Iowa 2001). Thus, the plan administrator was correct to conclude, in denying Mrs. Stamp's benefit claims, that "the weight of authority under applicable Federal law would not compel" a finding that Mr. Stamp's collision was accidental.[7]

---

[7] Mrs. Stamp cites two federal cases, King v. Hartford Life & Acc. Ins. Co., 357 F.3d 840 (8th Cir. 2004), and West v. Aetna Life Ins. Co., 171 F. Supp. 2d 856 (N.D. Iowa 2001), for the proposition that drunk driving deaths must be held to be "accidental" under the Wickman analysis. However, the Eighth Circuit vacated the King opinion to which she refers. King v. Hartford Life & Acc. Ins. Co., 414 F.3d 994 (8th Cir. 2005) (en banc). Upon rehearing, the

-12-

In applying the Wickman analysis to drunk-driving deaths, courts have stated that "'the hazards of drinking and driving are widely known and widely publicized'" and reasoned that, as a result, "the insured should have known that driving while intoxicated was highly likely to result in death or bodily harm." Eckelberry, 469 F.3d at 345 (quoting Nelson, 962 F. Supp. at 1012). As the Supreme Court recently observed, albeit in a different context, "[d]runk driving is an extremely dangerous crime." Begay v. United States, 128 S. Ct. 1581, 1584 (2008). It is common knowledge that the danger grows even more extreme as the driver's level of intoxication increases. Nat'l Hwy. Traffic Safety Admin., U.S. Dep't of Transp., Setting Limits, Saving Lives: The Case for .08 BAC Laws, DOT HS 809 241, revised Apr. 2001. Accordingly,

> any drunk driver who takes to the road should
> know he runs a risk of injuring another person
> [or himself]. The extent of the risk will of
> course vary from case to case, depending on
> how intoxicated the driver is, how far he
> drives, how fast he drives, and how many other

en banc court declined to reach the issue of whether the insured's claim was, as a matter of law, an accident under the Wickman test because the plan administrator had not explicitly applied Wickman in explaining its benefit denial. King, 414 F.3d at 1003-04. Instead, the court remanded the case to the plan administrator with directions to apply the Wickman test because the administrator had "abandon[ed] in litigation its original basis for denying benefits." Id. at 1005-06. The Eighth Circuit's disposition of King calls into question the continued vitality of West, which was decided by a district court in that circuit. See McElyea v. AIG Life Ins. Co., 326 F. Supp. 2d 960, 967 n.4 (E.D. Ark. 2004) (noting that the King panel had endorsed the West opinion but that the panel opinion had been vacated by the en banc court).

-13-

> drivers and pedestrians are sharing the road
> with him.

Lennon, 504 F.3d at 621 (quoting United States v. Rutherford, 54 F.3d 370, 376 (7th Cir. 1995)). Following this logic, courts have emphasized the decedent's level of intoxication when determining that a plan administrator's denial of benefits was reasonable. See, e.g., id. at 623 (BAC of more than three times the legal limit); Eckelberry, 469 F.3d at 345 (BAC of one and a half times the legal limit); Cozzie, 140 F.3d at 1106 (BAC of more than two times the legal limit). We endorse this approach.[8] The Wickman analysis does not require a categorical determination that all alcohol-related deaths are per se accidental or nonaccidental. Rather, it leads us to consider the circumstances of the fatal event in question.[9]

In this case, the plan administrator had substantial evidence that Mr. Stamp was severely intoxicated when he died. The toxicology report indicated that Mr. Stamp's BAC at the time of his

---

[8] The dissent asserts that we have "[d]eferentially follow[ed] in the footsteps of other circuits that have examined this question." Dissent at 24. That is not the case. We have simply noted the trend among federal courts. However, we have, as Wright and Firestone require, deferred to the decision of the plan administrator.

[9] The dissent appears to suggest that we are categorically concluding that all alcohol-related deaths could be considered nonaccidental. That is not so. On the contrary, we have been careful to explain that the proper approach is fact-specific and that the decedent's degree of intoxication is particularly probative.

-14-

death was in the range of .231% to .265%. MetLife's medical department had advised that this level of intoxication "would cause delirium intoxication. In a sporadic drinker it would cause lethargy, stupor, combativeness, incoherency & vomiting. In a chronic drinker, there would be [illegible] emotional changes and mood changes."[10] An internal Mobil memorandum, prepared during the review of Mrs. Stamp's claim, further elaborated:

> Various on-line sources indicate that Mr. Stamp's ability to control his vehicle would have been significantly impaired. For example, the National Highway Transportation Safety Administration states that all drivers, even experienced drivers, show impairment at a BAC of 0.08 – one-third the level reported for Mr. Stamp. The "Police Handbook" published by the Oklahoma University Police has the following descriptions of the effects of various BACs:
>> 0.20 Feeling dazed/confused or otherwise disoriented. May need help to stand/walk. Blackouts are likely.
>> 0.25 All mental, physical and sensory functions impaired.
> Our own medical department has confirmed that the assessments by MetLife and these internet sources are reasonable, and that serious impairment would be expected.

In its letter denying Mrs. Stamp's claims, Mobil noted that "[t]here is no evidence to suggest that another vehicle or object, mechanical failure, or adverse weather or road collisions contributed to the collision," and concluded that "Mr. Stamp's BAC

---

[10] We note that there is no evidence in the record to suggest that Mr. Stamp was anything more than a sporadic drinker.

-15-

was at least a substantial contributing cause of the collision." In light of this well-developed record of the severe impairment that would be expected from Mr. Stamp's level of intoxication and the administrator's reasonable inference that his drunk-driving was a "substantial contributing cause" of the crash, we cannot say that it was arbitrary and capricious for the administrator to determine that Mr. Stamp's death was not "as a result of an accident." In Wickman terms, it is not arbitrary and capricious to conclude that a reasonable person would view death or serious injury as a highly likely outcome of driving while so drunk that one may need help to stand or walk and is likely to black out.[11]

## IV.

Mrs. Stamp makes four arguments to support her claim that Wickman compels us to reach a contrary determination. First, she

---

[11] Mobil did not invoke the particular terms of Wickman in the denial letter it sent to Mrs. Stamp. Instead, it stated more generally that "the weight of authority under applicable Federal law would not compel" a finding that Mr. Stamp's death was an accident. The benefit denial is then explained in terms of the plan administrator's interpretation of the purposes of the plan. This conclusion is not arbitrary and capricious because of its failure to recite the Wickman formula. See Cozzie, 140 F.3d at 1110 ("We cannot say . . . that [the administrator's] determination that the purposes of the plan are best served by acknowledging a qualitative difference between the ingestion of a huge quantity of alcohol and other tragedies of human life which do not involve such a significant assumption of a known risk by the insured is incompatible with the goals of the plan."). The decision reached by the plan administrator is compatible with Wickman, even if the administrator did not explain his decision in Wickman terms. Moreover, Mrs. Stamp has not asserted that the plan administrator made a legal error by failing to recite the Wickman formula in its denial letter.

-16-

marshals evidence from phone calls earlier in the evening to make the case that her husband did not sound impaired, was "in good spirits," and was looking forward to a family event the next day. She concludes that this evidence indicates "clearly" that Mr. Stamp "had no subjective expectation of death or injury." We disagree. The conversations she cites shed little light on Mr. Stamp's state of mind many hours later after he had consumed more alcohol. Moreover, Mr. Stamp's actual subjective expectation that he would arrive safely at his parents' house, even if it were clearly established in the record, is not dispositive. In Wickman, we explicitly rejected the contention that "unless [the insured] actually expected to die, essentially that he specifically intended to commit suicide, his death must be considered an accident."[12] 908 F.2d at 1087. Instead, the critical determination under Wickman lies in an objective analysis of what the insured reasonably should have expected when he decided to drive while highly intoxicated.

Second, Mrs. Stamp contends that the statistical evidence she presented to the district court "establishes that it cannot be reasonably concluded by either common sense or legal analysis that

---

[12] The dissent frames the issue as "whether [Mr. Stamp] intended to kill himself by becoming intoxicated and driving while in this condition." Dissent at 26. While this is the appropriate inquiry under the policy exclusion for intentional self-inflicted injury, it is not the appropriate inquiry when considering the term "accident." Indeed, the theory that all deaths are accidental unless the decedent subjectively intended to die was explicitly rejected in Wickman. 908 F.2d at 1087.

-17-

death resulting from driving under the influence of alcohol is . . . 'highly likely.'" Her statistics, gleaned from a comparison of the number of drunk driving arrests and the number of alcohol related driving fatalities, show that "the statistical probability of a fatal accident resulting while driving under the influence of alcohol is 1.19%." However, as the district court properly noted, such statistics are "meaningless in this context." They simply do not take into account the degree of intoxication of the driver in question. As we noted earlier, the risk of being involved in a fatal crash rises as blood alcohol levels rise. Accordingly, statistics that do not differentiate between various levels of intoxication are inapposite. See Lennon, 504 F.3d at 623 ("[D]rivers with blood-alcohol levels above the legal limit as a group are far more likely to arrive home safely than drivers who are extremely drunk.").

Moreover, the focus of our objective analysis in Wickman was not on the statistical probability that death would occur from the decedent's actions. Instead, we were concerned chiefly with what a reasonable person would perceive to be the likely outcome of the intentional conduct. Wickman, 908 F.2d at 1089. Russian roulette provides an archetypal example of this critical distinction. From a statistical standpoint, the likelihood of dying from a single round of Russian roulette is 16% – one in six. Such a death is not "highly likely" if that phrase is taken to mean

-18-

"more likely than not" or "substantially certain."  In fact, those who play Russian roulette have a decent chance, statistically speaking, of not being injured.  Lennon, 504 F.3d at 623. Nonetheless, such a death "would not be publicly regarded as an accident" because the mortal risk associated with playing Russian roulette is patently obvious to any reasonable person.  Wickman, 908 F.2d at 1087.  Similarly, even if Mrs. Stamp had adduced evidence that those who drive while extremely drunk have a better than even chance of arriving home safely, that evidence would not have been dispositive.  Statistical analysis is simply not at the core of the Wickman analysis.[13]  Instead, as the Sixth Circuit has explained, Wickman's framework reflects that "at some point the high likelihood of risk and the extensive degree of harm risked, weighed against the lack of social utility of the activity, become not marginally but so overwhelmingly disproportionate that the resultant injury may be outside a definition of 'accidental' that is not unreasonably narrow."  Lennon, 504 F.3d at 623.  It was not arbitrary for the plan administrator here to conclude that Mr.

---

[13]  In its discussion of the relevance of statistics, the dissent analogizes to the high rate of lung cancer arising from smoking and states that "it would be highly unusual . . . to conclude that anyone who smokes is engaging in a suicidal act and is thus excludable from coverage under the policy."  Dissent at 29.  We agree that smoking is probably not a "suicidal act," but it is equally true that a smoker's death from lung cancer is not "accidental" within the meaning of an AD&D policy.  As we are concerned here with the definition of "accident" and not the definition of "suicide," the dissent's analogy is inapt.

-19-

Stamp's decision to drive while grossly intoxicated qualifies as overwhelmingly and disproportionately risky conduct.

Third, Mrs. Stamp challenges the conclusion that her husband's death was causally related to his intoxication. She speculates that the accident could have been caused by an attempt to avoid a collision with another vehicle or with an animal. Because we are concerned with the definition of "accident" as a threshold of eligibility for benefits, the burden of proof is on Mrs. Stamp to show the existence of coverage. See 17A Lee Russ & Thomas F. Segalla, Couch on Insurance § 254:16 (3d ed. 2007); see also Mario v. P&C Food Markets, Inc., 313 F.3d 758,765 (2d Cir. 2002) (asserting, in an ERISA case, that "the insured has the burden of proving that a benefit is covered, while the insurer has the burden of proving that an exclusion applies"); Jenkins v. Montgomery Indus., Inc., 77 F.3d 740, 743 (4th Cir. 1996) (same); Blair v. Metropolitan Life Ins. Co., 974 F.2d 1219, 1221 (10th Cir. 1992) (same). Mrs. Stamp's speculation regarding alternative causes for the collision falls far short of the evidence needed to carry her burden. As a result, the plan administrator's finding of fact as to causation is not "arbitrary and capricious."

Fourth, Mrs. Stamp invokes the contra proferentem doctrine, which holds that the policy terms must be strictly construed against the insurer and in favor of the insured.

However, this doctrine is only applied when courts undertake de novo review of plan interpretations:

> When the administrators of a plan have discretionary authority to construe the plan, they have the discretion to determine the intended meaning of the plan's terms. In making a deferential review of such determinations, courts have no occasion to employ the rule of contra proferentem. Deferential review does not involve a construction of the terms of the plan; it involves a more abstract inquiry – the construction of someone else's construction.

Morton v. Smith, 91 F.3d 867, 871 n.1 (7th Cir. 1996); see also Winters v. Costco Wholesale Corp., 49 F.3d 550, 554 (9th Cir. 1995). We are engaged in that "more abstract inquiry" here, and thus the doctrine is inapplicable to our review.

**V.**

Under the "arbitrary and capricious" standard, "we need not decide what is the best reading of the words in the insurance policy," Lennon, 504 F.3d at 624, nor how we would have applied those words de novo. Instead, we are called upon only to decide whether the plan administrator's denial of benefits was "'reasoned and supported by substantial evidence.'" Wright, 402 F.3d at 74 (quoting Gannon v. Metro. Life Ins. Co., 360 F.3d 211, 213 (1st Cir. 2004)). As we have set forth above, the administrator's determination that Mr. Stamp's death was nonaccidental is compatible with Wickman. Objectively, he reasonably should have expected death or serious injury when he drove with a BAC of more

-21-

than three times the legal limit.  That conclusion does not lessen the tragedy of Mr. Stamp's death.  It simply means that the plan administrator's denial of benefits was not arbitrary and capricious, and the judgment below is <u>affirmed</u>.

<u>So ordered.</u>

**- Dissenting Opinion Follows -**

**TORRUELLA, <u>Circuit Judge</u> (Dissenting).** Mrs. Stamp's ability to recover most of the insurance benefits at issue hinges on whether her husband's death was an accident within the meaning of the MetLife policies. It is clear to me that Mr. Stamp's death while driving under the influence of alcohol was the result of an accident. As the Supreme Court recently noted, "DUI . . . involves '<u>accidental</u> or negligent conduct.'" <u>Begay</u> v. <u>United States</u>, 128 S. Ct. 1581, 1587 (2008) (quoting <u>Leocal</u> v. <u>Ashcroft</u>, 543 U.S. 1, 11 (2004)) (emphasis added). In <u>Wickman</u> v. <u>Northwestern Nat'l Ins.</u>, 908 F.3d 1077, 1084 (1st Cir. 1990), we announced a standard for determining whether a death was "accidental" within the meaning of an ERISA-qualified policy. Noting that terms like "accident" "should be judged from the viewpoint of the insured," we promulgated a three-prong test because "actual expectation is often difficult, if not impossible to determine." <u>Id.</u> (1) "[The] reasonable expectations of the insured when the policy was purchased is the proper starting point for a determination of whether an injury was accidental under its terms." <u>Id.</u> at 1088. (2) "If the fact-finder determines that the insured did not expect an injury similar in type or kind to that suffered, the fact-finder must then examine whether the suppositions which underlay that expectation were reasonable." <u>Id.</u> (3) "Finally, if the fact-finder, in attempting to ascertain the insured's actual expectation, finds the evidence insufficient to accurately

determine the insured's subjective expectation, the fact-finder should then engage in an objective analysis of the insured's expectations."  Id.

The present case marks our first opportunity to apply the Wickman analysis to a factual scenario that involves a policy-holder who died with a heightened Blood Alcohol Content ("BAC") level in a one-car collision.  Deferentially following the footsteps of other circuits that have examined this question,[14] the majority concludes that Mr. Stamp's death was not accidental.  I cannot disagree more vehemently with that outcome.

I do not feel compelled to follow these prior opinions because I believe that in reaching this outcome, those cases misapplied the third prong of Wickman, an error duplicated by the majority, which also focuses too heavily on a "reasonably foreseeable" analysis.  See slip op. at 10.  In Wickman, we said that "[i]n [our] analysis, [we are required to] ask whether a reasonable person, with background and characteristics similar to the insured, would have viewed the injury as highly likely to occur as a result of the insured's intentional conduct."  908 F.3d at 1088 (emphasis added).

---

[14]  See Lennon v. Metro. Life Ins. Co., 504 F.3d 617 (6th Cir. 2007); Eckelberry v. Reliaster Life Ins. Co., 469 F.3d 340 (4th Cir. 2006); King v. Hartford Life & Accident Ins. Co., 414 F.3d 994 (8th Cir. 2005) (en banc); Buce v. Allianz Life Ins. Co., 247 F.3d 1133 (11th Cir. 2001); Cozzie v. Metro. Life Ins. Co., 140 F.3d 1104 (7th Cir. 1998).

I believe that those circuits that have examined insurance policy exclusions similar to the ones at issue here, using a "highly likely" or "substantially certain" standard, are the ones that have reached the correct answer to the question. See Padfield v. AIG Life Ins. Co. of Am., 290 F.3d 1121 (9th Cir. 2002); Santaella v. Metro. Life Ins. Co., 123 F.3d 456 (7th Cir. 1997) Todd v. AIG Life Ins. Co., 47 F.3d 1448 (5th Cir. 1995). Those circuits applied Wickman in a proper fashion by engaging in the following analysis:

> [F]or death under an accidental death policy to be deemed an accident, it must be determined (1) that the deceased had a subjective expectation of survival, and (2) that such expectation was objectively reasonable, which it is if death is not substantially certain to result from the insured's conduct.

Santaella, 1243 F.3d at 463 (quoting Todd, 47 F.3d at 1456) (emphasis added).

The administrator, which was affirmed by the majority, created out of whole cloth an exclusion ex post facto denying coverage where the decedent's BAC is above legal limits when death occurs. Rather than attempting to insert an exclusion by inference, what should be done in those cases in which the parties have not agreed to such a provision beforehand, is to have a clause specifically establishing such an exclusion. See Marcus Wilbers, Note, Alcohol-Related Car 'Accidents'? The Eighth Circuit Moves Toward Policy Change in ERISA Litigation, 71 Mo. L. Rev. 471, 491

-25-

(2006) ("To eliminate any uncertainty, plan administrators should include an alcohol-related exclusion in all accidental death insurance plans.").

The policies at issue here do not include a definition for "accident."  In Wickman, we said that "[c]ase law is fairly consistent in defining an accident, using equally ambiguous terms such as undesigned, unintentional, and unexpected."  Wickman, 908 F.2d at 1087; Santaella, 123 F.3d at 464 ("Interpreting the policy terms in an ordinary and popular sense, in the way that a person of average intelligence and experience would, we treat the term 'accidental' as it is commonly defined, as 'unexpected or unintentional.'" (footnote and citations omitted)).[15]  Applying Wickman, Mr. Stamp's death can be termed nothing other than an unfortunate accident.  The question is not, as the majority frames it, whether Mr. Stamp was severely intoxicated.  See slip op. at 14.  The question is whether he intended to kill himself by becoming intoxicated and driving while in this condition.  There is absolutely no evidence that Mr. Stamp had any such intention.

### I.  Wickman Analysis

The first prong of the Wickman analysis requires us to look at the reasonable expectation of the insured when the policy was purchased.  Wickman, 908 F.2d at 1088.  As we said in Wickman,

_____

[15]  Both the police and the autopsy reports indicated that the manner of death was "accidental."  This is not a mere coincidence.

-26-

"[g]enerally, insureds purchase accident insurance for the very purpose of obtaining protection from their own miscalculations and misjudgments." Id. Accepting that Mr. Stamp had a BAC above the legal limit and that he was in a one-car collision with no other evidence of why he veered off the road and hit a tree, it is fair to say that, at most, Mr. Stamp miscalculated and misjudged his ability to drive that fateful evening. He purchased insurance in order to protect himself and his family against such unforeseen accidents.

There is no evidence that Mr. Stamp's actions were the result of anything but misjudgments, not intentional actions. According to Joe Kingsley, he and Mr. Stamp discussed life insurance at some point prior to August 2. Mr. Stamp told Kingsley that he wanted to make sure that his wife and daughter would be "taken care of if anything happened" to him, adding that he had taken out significant life insurance for their benefit. On the night of his death, all evidence indicates that if Mr. Stamp would have continued along the route to his parents' house, he would have reached his destination. There is no indication that he attempted or intended to kill himself. There is no evidence that Mr. Stamp was distraught or that he was experiencing any personal problems. A few hours before the accident, he had positive, upbeat conversations with his wife, co-workers, and friend. His decision to drive was unlike the game of Russian roulette the majority

discusses because the point of that game is to see if you are lucky enough to live, see slip op. at 18, or that as in Wickman, he was doing something which objectively looked like suicide.

The second prong of the Wickman analysis instructs us to examine the reasonableness of the insured's expectations. See id. "The determination of what suppositions are unreasonable should be made from the perspective of the insured, allowing the insured a great deal of latitude and taking into account the insured's personal characteristics and experiences." Id. (internal citations omitted). Much more often than not, driving while under the influence has a non-fatal outcome. Cf. Todd, 47 F.3d at 1457 ("the risk of death from autoerotic practice is 'not of such a nature that [the decedent] knew or should have known that it probably would result in death. Death was not a normal expected result of the behavior.'" (citation omitted)(emphasis added)). In 2002, the year Mr. Stamp died, only forty-one percent of people who died in automobile-related collisions did so in collisions that involved a driver with a BAC above the legal limit. See U.S. Dep't of Transp., Traffic Safety Facts 2004 32 (2004). Almost sixty percent of the people who died that year did so from car accidents involving a driver with a BAC of zero. See id. Given this, it can be said that "a reasonable person would not view death as 'highly likely' to result from driving drunk.'" Michael E. Gardner, Note, Accidental Death Insurance Coverage of Drunk Drivers, 69 Mo. L.

-28-

Rev. 235, 246 (2004). Instead, "[i]t is not highly likely for an impaired driver to die in an alcohol-related wreck, and those deaths are therefore accidents." Id. at 472. Smoking cigarettes is responsible for eighty-seven percent of lung cancer deaths, see Am. Cancer Soc'y, Cancer Facts & Figures 2008 48 (2008), and nearly twenty percent of smokers die from heart disease, see Am. Heart Ass'n, Cigarette Smoking and Cardiovascular Diseases, (June 16, 2008). Yet it would be highly unusual where the administrator, or this Court, to conclude that anyone who smokes is engaging in a suicidal act and is thus excludable from coverage under this policy.

In any objective analysis, we must "ask whether a reasonable person, with background and characteristics similar to the insured, would have viewed the injury as highly likely to occur as a result of the insured's intentional conduct." Wickman, 908 F.2d at 1088 (internal citations omitted). In 2005, nearly 1.4 million drivers were arrested for driving under the influence of alcohol or narcotics. See United States Dep't of Justice, Crime Prevention in the United States 2005, Table 29. This number is much higher, both empirically and as a percentage, than the number of people who died as a result of driving under the influence. Thus, "[w]hat common knowledge . . . actually tell[s] a person driving while intoxicated is that he or she is far more likely to be arrested for driving while intoxicated than to die or be injured

-29-

in an alcohol-related automobile crash, and far more likely to arrive home than to be either arrested, injured, or killed." West v. Aetna Life Ins. Co., 171 F. Supp. 2d. 856, 904 (N.D. Iowa 2001).

The likelihood of death is even less probable when we take into account that the number of people arrested for drunk driving is lower than one percent of the 159 million self-reported cases of alcohol-impaired driving among adults in the United States each year. See Kyran P. Quinlan et al., "Alcohol-Impaired Driving Among U.S. Adults, 1993-2002," 28 Am. J. of Preventive Med., 346, 348-49 (2005). These statistics do not demonstrate that it is highly likely that someone who is driving under the influence will die.

Thus, Mr. Stamp "had a subjective expectation of survival and . . . such an expectation was objectively reasonable because death was not certain or even highly likely to result from [his] conduct." Santaella, 123 F.3d at 464 (citing Todd, 47 F.3d at 1456). "Drunk driving is, to be sure, a foolish and reckless act. However, when an insured dies as a consequence of his driving while intoxicated, his death should still be considered accidental because a reasonable person would not view death as a natural and probable consequence of drunk driving." Gardner, supra at 253. It cannot be said that Mr. Stamp expected or intended to kill himself. See Santaella, 123 F.3d at 463 ("[T]he record simply would not

support a jury determination that a reasonable person in [the decedent's] situation would have considered death either 'highly likely to occur' . . . or 'substantially certain to result from the insured's conduct.'" (citations omitted)). I believe that appellees abused their discretion when they denied Mrs. Stamp's claims because of a determination that Mr. Stamp's death was not an accident. Mrs. Stamp's claims, however, were denied on other grounds as well. We examine those grounds below.[16]

## II. Intentionally Self-Inflicted Injury Exclusion

The inquiry for examining policy exclusions for intentional self-destruction and intentionally self-inflicted injury mirrors the analysis above. Given the facts, and knowing that Mr. Stamp was on his way to his parents' house to meet his family, it cannot be said that his death was the result of a self-inflicted injury. In <u>Wickman</u>, the decedent drove onto a bridge, got out of his car, and went to a part of the bridge that he only would have gone to if he intended to kill himself. See <u>Wickman</u>, 908 F.2d at 1079-80. We found that his death was not the result of an accident. See <u>id.</u> at 1089. "[A] reasonable person in Wickman's shoes would have expected to die or be seriously injured as result of [his actions]." <u>Id.</u> at 1088. That cannot be said here. There is no evidence that he intentionally struck the tree which caused

---

[16] The majority did not examine the other policies because they also require the death to be a result of an accident. See slip op. at 5 n.3.

his death. "[T]he record [does] not support a determination that the insured 'did anything other than make a fatal mistake.'" Padfield, 290 F.3d at 1121 (quoting Santaella, 123 F.3d at 465).

As with the term "accident," there is no definition in the policy of "intentionally self-inflicted injury." In ERISA cases, we use federal common law rules to "'interpret the terms of the policy in an ordinary and popular sense, as would a person of average intelligence and experience,' and 'construe all plan ambiguities in favor of the insured.' Plan language may only be deemed ambiguous where 'it is subject to more than one reasonable interpretation.'" Santaella, 123 F.3d at 461 (quoting Life Ins. Co. of N. Am. v. Von Valtier, 116 F.3d 279, 283 (7th Cir. 1997)). A person of average intelligence and experience would not think that someone who dies in a one-car collision, even with a BAC above the legal limit, intentionally caused his own death.[17] No doubt, Mr. Stamp's decision to drive while intoxicated was risky, "but voluntary risky acts resulting in injury are not necessarily acts that result in 'intentionally self-inflicted injury.'" Padfield, 290 F.3d at 1129. Accordingly, I believe that Mrs. Stamp's claim for Basic AD&D insurance benefits should not have been denied by Appellees.

---

[17] As previously noted, both the police and the autopsy reports classified the manner of death as "accidental."

### III. Crime Exclusion

Both the Voluntary and Occupational AD&D policies have exclusions for decedents who die while "committing or attempting to commit a felony or other serious crime." Appellees denied Mrs. Stamp's claim because Mr. Stamp had a BAC level above the legal limit while he was operating his vehicle.

I believe that the exclusion is inapplicable and find that the Appellees abused their discretion when they found that Mr. Stamp committed a serious crime. Mr. Stamp was operating his vehicle in Rhode Island when he died, and under Rhode Island law it is not a felony to operate a vehicle while under the influence of alcohol; it is a misdemeanor. See Rhode Island Motor Vehicle Offenses, § 31-27-2(a).[18] By definition, a misdemeanor is not a serious crime. See United Union of Roofers, Waterproofers, & Allied Workers, Union No. 33 v. Meese, 823 F.2d 652, 656 (1st Cir. 1987) ("the 'misdemeanor' label typically applies to crimes that are not very serious") (citation omitted). Accordingly, I would find that the crime exclusion does not apply, and that Mrs. Stamp is entitled to Voluntary AD&D benefits. This does not answer

---

[18] The Rhode Island statute reads in relevant part:

(a) Whoever drives or otherwise operates any vehicle in the state while under the influence of any intoxicating liquor, drugs, toluene, or any controlled substance as defined in chapter 28 of title 21, or any combination of these, shall be guilty of a misdemeanor except as provided in subdivision (d)(3) and shall be punished as provided in subsection (d) of this section.

-33-

whether Mrs. Stamp is entitled to Occupational AD&D because that policy requires death to occur "while at work."

### IV. "While at Work" Exclusion

In order for Mrs. Stamp to qualify for Occupational AD&D benefits she had to demonstrate that Mr. Stamp was "at work" when he died. The policy clearly states that "while at work" "does not include any personal time taken before, during or following a Mobil-approved business trip." Mrs. Stamp argues that Mr. Stamp was "at work" because the meeting he attended was mandatory and he died on his way back from the meeting. ExxonMobil noted that Mr. Stamp was no longer "traveling from" the work-related business meeting when he died. ExxonMobil also noted Mr. Stamp stopped "for several hours for a separate, purely personal purpose."

According to Mrs. Stamp, Mr. Stamp's co-workers, and Kingsley, Mr. Stamp was not inebriated when he left his work function. Mr. Stamp was legally inebriated when he died; his BAC level was three-times the legal limit. Given the road conditions, the weather, and Mr. Stamp's conversation with Kingsley at about 9:30 p.m., Mr. Stamp should have reached his parents' house by 10:30 p.m. Yet, by midnight, he still had not reached his destination. The conclusion that Mr. Stamp became inebriated by reason of some non-work related activity after he left the work function is supported by circumstantial evidence. Thus, I would find that ExxonMobil did not abuse its discretion when it

-34-

determined that Mr. Stamp's collision occurred during "personal time taken . . . following" his trip and that Mrs. Stamp is not entitled to recover under the Occupational AD&D policy.

### V.   Conclusion

For the reasons explained above, I dissent.